## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

MARGARET D. IVEY,

        Plaintiff,

   v.

SAVANNAH-CHATHAM PUBLIC
SCHOOLS,

        Defendant.

CIVIL ACTION NO.: 4:20-cv-16

## **O R D E R**

This action arises out of the disability-based discrimination and retaliation Plaintiff Margaret Ivey claims she suffered during her employment as a teacher with Defendant Savannah-Chatham Public Schools.[1] (Doc. 1.)  Plaintiff, proceeding *pro se*, sued Defendant for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"). (Id. at p. 3.)  Specifically, she asserts that Defendant discriminated against her because of her disability, failed to accommodate her disability, and retaliated against her in violation of the statute. (Id. at p. 4.)  Presently before the Court are Plaintiff's Motion for Summary Judgment, (doc. 15), and Defendant's Motion for Summary Judgment, (doc. 17).  Defendant filed a Response to

---

[1] Plaintiff's Complaint misidentified Defendant.  (Doc. 4, p. 1.)  Defendant's proper name is the Savannah-Chatham County Public School System.  (Id.)  Because Defendant acknowledges that Plaintiff intended to assert a claim against it and because Defendant has been actively defending against this suit, the Court finds that no prejudice against Defendant has resulted and, thus, addresses the parties' motions.  See, e.g., Transcon. Ins. Co. v. L.F. Staffing Servs., Inc., No. 07-80865-CIV-RYSKAMP/VITUNAC, 2008 WL 11333664, at *4 (S.D. Fla. Aug. 13, 2008) ("[W]hen a plaintiff has actually sued and served the correct party, but merely mistakenly used the wrong defendant's name, a mere misnomer exists and it may be disregarded where it is fairly certain that no prejudice has resulted to the defendant.") (citing United States v. A.H. Fischer Lumber Co., 162 F.2d 872, 874 (4th Cir. 1947)).

Plaintiff's Motion.  (Doc. 20).  Though Plaintiff did not file a Response to Defendant's Motion, she did file an Amended Motion for Summary Judgment, (doc. 19; see also doc. 22).  For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 17), and **DENIES** Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment, (docs. 15, 19).

## BACKGROUND

### I.      Plaintiff's Disability

Plaintiff contends that she suffered from a "degenerative disease of [her] back with spine" and "back/nerve damage" throughout her employment with Defendant.  (Doc. 1, p. 4; doc. 1-1, p. 1; doc. 17-2, p. 5.)  During her deposition, Plaintiff could not remember the exact date she was diagnosed with a spine disease, but she stated that she was diagnosed "some years before" she started working for Defendant and that it is an "ongoing condition[]" that developed prior to her employment with Defendant.  (Doc. 17-2, pp. 5–9.)  Furthermore, while "back/nerve damage" is the only disability listed in Plaintiff's Complaint, (doc. 1, p. 4), Plaintiff stated in her deposition that she also suffers from depression and anxiety, which she claims are caused by her back condition, and that the onset of the depression and anxiety predates her employment with Defendant.  (Doc. 17-2, pp. 16–17.)

### II.     Plaintiff's Employment with Defendant

#### A.      Issues with Job Performance and Coworkers at Pulaski Elementary School

Plaintiff began her employment with Defendant as a "teacher-on-loan" in June 2017.  (Doc. 17-2, pp. 18–19.)  At the time Plaintiff was hired, she did not tell anyone "at the District" that she suffered from a spine disease, depression, or anxiety, nor did she request any accommodations for those conditions.  (Id. at pp. 19–20.)

In Fall 2018, Plaintiff worked as a kindergarten teacher at Pulaski Elementary School.  (Id. at pp. 34–35.)   On November 27, 2018, and December 7, 2018, Plaintiff underwent job performance assessments conducted by Principal Antonio Byrd and Assistant Principal Christina Tucker.  (Id. at pp. 42–44, 79–84; doc. 17-6, pp. 3, 13–18.)   Plaintiff received several Level II scores, indicating that Plaintiff "need[ed] improvement" in several categories, including instructional planning, differentiated instruction, and communication.  (Doc. 17-2, pp. 79, 82–84; doc. 17-6, pp. 3, 13–18.)

On January 8, 2019, Plaintiff complained to Superintendent Ann Levett about the conduct of her co-teacher and paraprofessional, who were allegedly bullying Plaintiff through "name calling, taunting, unprofessional comments, and deliberately not doing their jobs."  (Doc. 17-2, pp. 47, 72–73.)   Plaintiff stated that she could not "show up to work . . . with this continued bullying and having to do other people's jobs."  (Id. at p. 73.)   Plaintiff's problems with her co-workers then persisted.   On January 17, 2019, Assistant Principal Tucker emailed Plaintiff regarding two new allegations of communication and planning problems between Plaintiff and her co-workers, which Tucker described in detail in her email.  (Id. at pp. 75–76.)   Plaintiff responded that, among other things, she did not "appreciate being attacked with all of this nonsense," that her co-workers were "both liars," and that one of her co-workers grabbed a student "while yelling at him and then shoved him" during class on December 19, 2018.  (Id. at pp. 74–75.)   Plaintiff also notified the human resources department that Principal Byrd and Assistant Principal Tucker were "retaliat[ing] against and intimidat[ing]" her because of her complaint to Superintendent Levett.  (Id. at pp. 88–89.)   On January 22, 2019, Principal Byrd, Assistant Principal Tucker, and Executive Director Kimberly Hancock (Byrd's supervisor) met with Plaintiff to discuss her complaints, and they offered to have the District facilitate a mediation of the dispute between Plaintiff and her co-

workers.  (Doc. 17-6, p. 4.)  Plaintiff declined to participate in any mediation, and on January 29, 2019, Principal Byrd moved Plaintiff into a teacher-on-loan position at Pulaski.[2]  (Id.; doc. 17-2, pp. 35–36.)  In this new role, Plaintiff retained the same salary and benefits but no longer worked with the co-teacher and paraprofessional.  (Doc. 17-6, p. 5.)  After informing Plaintiff of this decision, Principal Byrd told her to notify him "of the date and time when she would like to gather her materials" from her old classroom.  (Id.)

### B.   Plaintiff's Accident and Workers' Compensation Claim

On January 30, 2019, at 6:30 a.m., Plaintiff—without notifying Principal Byrd or any other school administrator—began removing her belongings from her old classroom.  (Doc. 17-2, pp. 54–55, 92, 94–95.)  While moving items from the classroom and lifting them into her vehicle, she sustained injuries to her lower back, ankle, and right leg.  (Id. at pp. 56, 95.)  Plaintiff then sent a "Supervisor's Accident Report" to Assistant Principal Tucker and filed a workers' compensation claim.  (Id. at pp. 93–95.)  The Accident Report briefly described the accident but did not contain any reference to Plaintiff's pre-existing back condition, depression, or anxiety.  (See id. at pp. 94–95.)  Instead, the only reference to any medical injury or condition in the Accident Report is Plaintiff's statement that "[l]ifting heavy item [sic] in class and into [her] vehicle caused injur[ies] to [her] back, ankle, and right leg."  (Id.)

Based on the timing, circumstances, and video footage of Plaintiff's alleged injury, Principal Byrd was suspicious of whether Plaintiff had actually sustained an injury.  (Doc. 17-6, p. 6.)  Thus, he reported the accident—along with his suspicions—to Executive Director Hancock and Director of Risk Management Rob Gordon.  (Id. at pp. 6, 33.)  Gordon notified Rzlyn

---

[2] A teacher-on-loan is a "teacher, who, instead of being assigned to a particular grade level or classroom, may be assigned on a daily or sometimes extended basis to different classes to teach for absent teachers or to assist teachers who could use additional support."  (Doc. 17-6, p. 5.)

Williams, a claims adjuster for Underwriters Safety & Claims,[3] about Plaintiff's injuries, and both agreed that Plaintiff's workers' compensation claim should be denied.  (Doc. 17-3, pp. 1, 4.)  While Williams does not remember whether she "spoke directly with [Plaintiff] about her workers' compensation claim," (id. at p. 4), Plaintiff contends that she called and spoke to Williams over the phone, (doc. 17-2, p. 22).  During that phone call, Plaintiff told Williams that she suffered from "an injury that was a disability," (id.), but according to Williams's affidavit, even if she did speak with Plaintiff and learned about her pre-existing medical conditions, she did not relay that information to school administrators as she "had no discussions with District staff about whether [Plaintiff] had a disability that needed accommodation under the ADA," (doc. 17-3, p. 5). Williams sent Plaintiff a letter denying her claim.  (Id. at p. 4.)

On February 4, 2019, Plaintiff reported to Pulaski for the first time since the morning she fell, and she presented Principal Byrd with a doctor's note requesting that she be placed on "light duty."  (Doc. 17-2, p. 23; doc. 17-6, p. 6; doc. 15-1, p. 1.)  Principal Byrd and Assistant Principal Tucker informed her that she could not return to work without a "full-duty release."  (Doc. 17-6, pp. 6–7; see also doc. 17-2, p. 23.)  While Principal Byrd and Assistant Principal Tucker saw the "injury form," Plaintiff did not inform either of them that she suffered from a degenerative spine disease or any other medical condition, except for the injuries she sustained when she fell on January 30, 2019.  (Doc. 17-2, pp. 23–24.)  According to Plaintiff, "as far as [she knew], [Byrd and Tucker] knew [she] reported a work injury but did not know about [her] underlying degenerative condition."  (Id. at p. 25.)  Furthermore, Plaintiff did not "remember talking about

---

[3] Underwriters Safety & Claims is "the third-party administrator for the Savannah-Chatham County Public School System's worker[s'] compensation program."  (Doc. 17-3, p. 2.)  As a claims adjuster for Underwriters Safety & Claims, Williams "review[s] and process[es] workers' compensation claims for Underwriters' clients, including [Defendant]."  (Id.)  However, Defendant does not directly employ Williams.  (Id.)

[her] underlying degenerative condition, back condition[,] or . . . depression or anxiety with anybody in the human resources department." (Id.)  After Principal Byrd denied Plaintiff's light-duty request, Plaintiff left work and returned three days later with a full-duty release.  (Doc. 17-6, p. 7.)

     **C.**    **Transfer to Bloomingdale Elementary School and Subsequent Job Performance**

Upon Plaintiff's return to work, Principal Byrd presented her with a Letter of Serious Concern and a Professional Development Plan ("PDP") outlining his concerns about her "delay in reporting the claimed December 18, 2018[,] shoving incident by the paraprofessional in her classroom" and her "communications issues." (Id. at pp. 7, 39–41.)  Plaintiff contested the PDP, which she claims was "false," "defamatory," and an attempt to "impugn [her] character." (Doc. 1-1, p. 1; see also doc. 17-6, p. 7.)  After observing "continued deficiencies in [Plaintiff's] performance" and due to concern that Plaintiff's "personal relationships with [him], Assistant Principal Tucker, and her co-workers had deteriorated," Principal Byrd requested that Plaintiff be transferred to a different school within the school district.  (Doc. 17-6, p. 8; see also doc. 1-1, p. 1.)

On February 11, 2019, Plaintiff was transferred to Bloomingdale Elementary School to work as a teacher-on-loan.  (Doc. 1-1, p. 1; doc. 17-6, p. 8; doc. 17-7, p. 2.)  Plaintiff's new job at Bloomingdale Elementary provided her "with the same salary and benefits that she had at Pulaski" but at a different location.  (Doc. 17-6, p. 8.)  Upon Plaintiff's transfer to Bloomingdale Elementary, the principal at that school, Aysha Parks, received the PDP and presented it to Plaintiff.  (Doc. 1-1, p. 1; doc. 17-7, p. 3.)  Plaintiff once again contested the PDP.  (Doc. 1-1, p. 1; doc. 17-7, p. 3.)  Plaintiff did not tell Principal Parks about her back condition or her anxiety

and depression, nor did Plaintiff request an accommodation from Principal Parks regarding those conditions.  (Doc. 17-2, p. 27.)

In April 2019, problems arose regarding Plaintiff's job performance at Bloomingdale Elementary.  On April 26, 2019—which was the day after Plaintiff attended a deposition in connection with her workers' compensation claim—Principal Parks emailed Plaintiff regarding parent and student complaints about Plaintiff's conduct during a class on April 24, 2019.  (Doc. 17-2, p. 31; doc. 17-7, pp. 3–4, 17; see also doc. 1-1, pp. 1–2.)  Plaintiff responded that she "had no idea what [Principal Parks] or the students [were] talking about as far as incidents that occurred on Wednesday" and that "kids go home and tell parents whatever they please."  (Doc. 17-7, p. 16.) Principal Parks responded that they needed to "discuss the day so that [she] can report back to parents and reassure students in [the] class" and requested to see Plaintiff during a school meeting. (Id.)  Plaintiff missed the meeting and informed Principal Parks via email that she did not know "who, what, when, where, or what allegations are at issue" and that she "should not have to account for false information . . . students are going home [and] sharing with their parents."  (Id. at p. 15.) Principal Parks believed the "tone" of Plaintiff's email warranted a "face-to-face" conversation and directed Plaintiff to meet with her on the morning of April 29, 2019, to discuss the complaints. (Id.)  Plaintiff then sent Principal Parks a letter stating that "[her] attorneys [were] aware . . . of [Principal Parks] harassing [her] with these false allegations and all previous forms of harassment" and that "[a]lthough [she would] be attending the meeting and per previous communication, [she would] forego any further communication regarding the matter."  (Id. at p. 21.)  Plaintiff also requested that Principal Parks "cease [her] harassment against [Plaintiff] that has been happening since [she] arrived at the school" and stated that "[i]f [Principal Parks] ha[d] any further concerns [she] may direct them to [Plaintiff's] attorney," though she did not identify her attorney.  (Id.)

7

When Plaintiff met with Principal Parks and Director of Risk Management Gordon, she informed them that she did not have "anything else to offer" about the parent and student complaints.  (Doc. 1-1, p. 2; <u>see also</u> doc. 17-7, p. 6.)  According to Principal Parks, following Plaintiff's refusal to discuss the complaints, she was not comfortable having Plaintiff working in a classroom, so she asked Plaintiff to work from the media center until the issue concerning the complaints was resolved.  (Doc. 17-7, p. 6; <u>see also</u> doc. 1-1, p. 2.)  Plaintiff's salary and benefits did not change while she worked from the media center.  (Doc. 17-7, p. 6.)

### D.    Non-renewal of Plaintiff's Employment

After the April 29, 2019, meeting, Principal Parks contacted the human resources department "about [the] next steps to take with respect to [Plaintiff]."  (<u>Id.</u>)  According to Principal Parks, she was told to complete her investigation and to evaluate whether Plaintiff's conduct "failed to comply with professional standards."  (<u>Id.</u>)  Principal Parks then asked a counselor to further investigate the parent and student complaints and to obtain statements from parents and students.  (<u>Id.</u> at pp. 7, 22–36.)  Based on the counselor's report and gathered statements, Principal Parks determined that Plaintiff's conduct did not promote several professional standards, including the standards for a positive learning environment, professionalism, and communication.  (<u>Id.</u> at p. 7.)  According to Principal Parks' testimony, she also felt that Plaintiff's conduct was unprofessional based on Georgia's Professional Code of Conduct for Educators, Standard 9, and that Plaintiff's responses to her April 26 email constituted insubordination.  (<u>Id.</u>)  On May 6, 2019, Principal Parks met with Plaintiff and presented her with: (1) a memorandum regarding the findings of the investigation into the student and parent complaints; (2) a Letter of Serious Concern outlining how Plaintiff had refused to discuss the parent and student complaints in person and how that refusal "rose to the level of insubordination" and violated several professional standards; (3)

a summative evaluation outlining the deficiencies in Plaintiff's job performance, including deficient scores in the professionalism, positive learning environment, and communication categories; and (4) a notice informing Plaintiff that Principal Parks was recommending her for "possible non-renewal." (Id. at pp. 8, 42–48; see also doc. 1-1, p. 2.) According to Plaintiff, these documents were false and amounted to a "concocted allegation list." (Doc. 1-1, p. 2.)

Principal Parks then submitted this paperwork—called a Professional Review Panel Packet—to the Professional Review Panel for consideration of non-renewal or other discipline.[4] (Doc. 17-7, pp. 8–9; doc. 17-5, p. 3.) Ramon Ray, Director of Human Resources for Defendant and a member of the Professional Review Panel, reviewed the Packet, (doc. 17-5, pp. 7–72), and found that Plaintiff "had been insubordinate in response to Principal [Parks'] attempts to discuss parent[] and student complaints . . . and had poorly performed with respect to several professional standards," including the specific standards that Principal Parks had expressed concern about, (id. at pp. 4–5). Given that Plaintiff had rejected the previous PDP (imposed by Principal Byrd), "[had] not respond[ed] to . . . Principal Parks in a professional manner," and "had a history of responding unprofessionally to criticism," Ray "determined that it was unlikely that additional attempts to improve [Plaintiff's] performance would be productive" and recommended to Superintendent Levett during a May 15, 2019, meeting that Plaintiff's contract not be renewed. (Id. at p. 5; doc. 17-4, p. 3.) Superintendent Levett testified in a sworn affidavit that, in reaching her decision on the non-renewal recommendation, she did not consider any actual or perceived disability, including any claimed degenerative back condition, anxiety or depression, that Plaintiff may have been suffering, and she was, in fact, unaware that Plaintiff had or claimed any disability. (Doc. 17-4, p. 3.) Superintendent Levett approved the non-renewal recommendation and made the same

---

[4] The Professional Review Panel considers, upon referrals from principals, whether an employee should be placed on a professional development plan or subject to other forms of discipline. (Doc. 17-5, p. 2.)

recommendation to the school board, which approved Plaintiff's non-renewal. (Id.) Superintendent Levett then sent a Notice of Non-Renewal to Plaintiff. (Id. at pp. 3, 19.)

## III.   Procedural History

### A.   EEOC Charge

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter, "EEOC Charge") on October 22, 2019. (Doc. 1-2, pp. 1–2.) In the EEOC Charge, Plaintiff stated that Defendant's discriminatory conduct began on February 4, 2019, and ended on May 15, 2019. (Id. at p. 1.) Under the section titled "Discrimination Based On," Plaintiff checked the box for "disability" but did not check any other box, including the "retaliation" box. (Id.) Finally, under the section titled "The Particulars Are," Plaintiff wrote:

> I began my employment with [Defendant] on July 25, 2017[,] as an elementary school teacher. On January 30, 2019, I was instructed by Antonio Byrd, Princip[al], to pack my things and move out of my classroom. While packing my belonging[s] into my car, I exacerbated my disability. On January 31, 2019, I filed for workmans [sic] compensation[,] and my claims were denied. On February 10, 2019, I was transferred to Bloomingdale Elementary. On April 25, 2019, I was granted a hearing from my appeal[,] and my claims were still denied. On April 29, 2019, I met with Aysha Parks, Princip[al,] and Rob Gordon, Risk Management[,] to inquire about an incident that occurred in my classroom. I denied any recollection of the incidents. On May 06, 2019, I was called to meet with Ms. Parks and was told she would be recommending nonrenewal of my contract. On May 16, 2019, I was notified via mail that my contract was ended and not to be renewed. . . . My employer told me my contract would not be renewed because of poor work performance. . . . I believe I have been discriminated against due to my in [sic] violation of Title I of the Americans with Disabilities Act of 1990, as amended.

(Id. at pp. 1–2.) On October 28, 2019, the EEOC dismissed Plaintiff's case and mailed her a Dismissal and Notice of Rights. (Id. at p. 3.)

### B.   Proceedings before this Court

Plaintiff, proceeding *pro se*, filed her Complaint initiating this suit on January 27, 2020, (doc. 1), and Defendant subsequently filed an Answer, (doc. 4). Plaintiff filed a Motion for

Summary Judgment, (doc. 15), and Defendant then filed its own Motion for Summary Judgment, (doc. 17).   Defendant filed a Response to Plaintiff's Motion, (docs. 20, 21), but Plaintiff did not respond to Defendant's Motion.   Instead, Plaintiff filed an Amended Motion for Summary Judgment.  (Doc. 19.)

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  Accordingly, in considering Plaintiff's motion for summary judgment, the Court will view the facts in the light most favorable to Defendant, and in considering Defendant's motion, the Court will view the facts in the light most favorable to Plaintiff.  See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).  Nonetheless, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).

Additionally, in its analysis, the Court will abide by the long-standing principle that pleadings drafted by unrepresented parties are held to a less stringent standard than those drafted by attorneys and, therefore, must be liberally construed.  See Haines v. Kerner, 404 U.S. 519, 520 (1972).  However, Plaintiff's unrepresented status will not excuse mistakes regarding procedural rules.  McNeil v. United States, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); see also Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990)

("Although we must view factual inferences favorably toward the nonmoving party and pro se complaints are entitled to a liberal interpretation by the courts, we hold that a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment.").

## DISCUSSION

In her Complaint, Plaintiff alleges that Defendant violated the ADA by discriminating against her due to her back condition. (Doc. 1, p. 4.) While Plaintiff is not clear about which factual allegations support which claims, Plaintiff generally asserts claims for disability discrimination, failure to accommodate, and retaliation. (Id. at pp. 3–4.) Plaintiff also alleges that Defendant is "continu[ing] to retaliate [against her] by providing not so good reference[s] if contacted by employers," but neither the Complaint nor the record elaborate on this allegation or show whether Defendant provided any of these references before or after Plaintiff filed her EEOC Charge. (Doc. 1-1, p. 2.)

In its Motion for Summary Judgment, Defendant argues that Plaintiff failed to properly and timely exhaust her administrative remedies with the EEOC, that Plaintiff cannot establish the prima facie elements for her claims, and that Defendant had legitimate, non-discriminatory reasons for its alleged discriminatory conduct that Plaintiff cannot sufficiently rebut. (See generally doc. 17.) Though unclear, Plaintiff appears to argue in her Motion for Summary Judgment that she is entitled to judgment in her favor on all her claims. (See generally docs. 15, 19.) Specifically, Plaintiff argues that "the court should enter summary judgment in favor of [her]" because Defendant "engaged in unlawful discrimination, retaliation, and refusal to provide reasonable accommodations," conduct that "might well have dissuaded a reasonable employee from making

or supporting a charge of discrimination."[5]  (Doc. 19, pp. 4, 13.)  Plaintiff also argues that "[t]he Superintendent, central staff personnel, and school principals (Mr. Byrd and Mrs. Parks) worked in concert to ensure [Plaintiff] would no longer be employed with the school system."  (Id. at p. 12.)  For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 17), and **DENIES** Plaintiff's Motion for Summary Judgment, (docs. 15, 19).

## I.     Exhaustion of Administrative Remedies

### A.     Scope of EEOC Charge

Defendant argues that the only claim Plaintiff raised in her EEOC Charge is her disability discrimination claim regarding her non-renewal.  (Doc. 17, p. 19.)  Thus, according to Defendant, Plaintiff did not exhaust her administrative remedies as to any claims relying on the theories of failure to accommodate, unequal terms and conditions of employment, or retaliation.  (Id.)

Before a plaintiff may pursue ADA claims in federal court, the plaintiff must present those claims to the EEOC so that the EEOC has the "first opportunity to investigate the alleged discriminatory practices [and] . . . perform its role in obtaining voluntary compliance and promoting conciliation efforts."  Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004); see also Zillyette v. Cap. One Fin. Corp., 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII . . . .").  Therefore, "[a] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of

---

[5] Plaintiff also appears to raise in her Motion—for the first time—a due process claim based on Defendant not "allowing the situation to be addressed through a proper protocol."  (Doc. 19, p. 11; see also doc. 15, p. 9.)  However, Plaintiff's attempt to add this claim is improper.  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a)."  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).  Thus, Plaintiff's apparent attempt to add a due process claim in her Motion for Summary Judgment is not effective.

discrimination." <u>Mulhall v. Advance Sec., Inc.</u>, 19 F.3d 586, 589 n.8 (11th Cir. 1994). "[A]llegations of new acts of discrimination" contained in a plaintiff's complaint but not in an EEOC charge "are inappropriate." <u>Batson v. Salvation Army</u>, 897 F.3d 1320, 1327 (11th Cir. 2018); <u>see also</u> <u>Ray v. Freeman</u>, 626 F.2d 439, 443 (5th Cir. 1980) ("Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review, are not appropriate.").[6]   To determine whether an EEOC charge raises the claims alleged in a complaint, "the proper inquiry . . . is whether [the plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge." <u>Gregory</u>, 355 F.3d at 1280.   However, while new acts of discrimination are impermissible, courts should be "extremely reluctant to allow procedural technicalities to bar claims brought under" the ADA. <u>Id.</u>   Thus, "the scope of an EEOC complaint should not be strictly interpreted." <u>Id.</u>

Here, on the EEOC Charge—under the section titled "Discrimination Based On"—Plaintiff checked the box for "disability" but did not check any other box, including the "retaliation" box.  (Doc. 1-2, p. 1.)  Furthermore, under the section titled "The Particulars Are," Plaintiff stated:

> I began my employment with [Defendant] on July 25, 2017[,] as an elementary school teacher.  On January 30, 2019, I was instructed by Antonio Byrd, Princip[al], to pack my things and move out of my classroom.  While packing my belonging[s] into my car, I exacerbated my disability.  On January 31, 2019, I filed for workmans [sic] compensation[,] and my claims were denied.  On February 10, 2019, I was transferred to Bloomingdale Elementary.  On April 25, 2019, I was granted a hearing from my appeal[,] and my claims were still denied.  On April 29, 2019, I met with Aysha Parks, Princip[al,] and Rob Gordon, Risk Management[,] to inquire about an incident that occurred in my classroom.  I denied any recollection of the incidents.  On May []6, 2019, I was called to meet with Ms. Parks, and was told she would be recommending nonrenewal of my contract.  On May 16, 2019, I was notified via mail that my contract was ended and not to be renewed. . . .  My

---

[6]  In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the former United States Court of Appeals for the Fifth Circuit handed down prior to October 1, 1981.

employer told me my contract would not be renewed because of poor work performance. . . .  I believe I have been discriminated against due to my in [sic] violation of Title I of the Americans with Disabilities Act of 1990, as amended.

(Doc. 1-2, pp. 1–2.)

In comparison to these allegations, Plaintiff's Complaint initiating this lawsuit generally alleges claims for disability discrimination, failure to accommodate her disability, and retaliation, though it does not make clear which factual allegations allegedly support which claims, including which of Defendant's acts allegedly support the claims for failure to accommodate and retaliation. (See generally docs. 1, 1-1.)  However, Plaintiff does argue in her Motion for Summary Judgment that Defendant committed eleven "acts of retaliation" for "requesting a reasonable accommodation," including transferring her to a "less desirable position," reducing her job responsibilities, conducting unjustified evaluations, failing to provide evaluations afforded to other educators, making "unfounded charges" against her to keep her from "exercising rights under [the] act," placing her in a more difficult work environment, harassing and coercing her, placing her "in a position to be scrutinized by other employees," "[o]pposing practice thought to constitute unlawful discrimination," and denying her opportunities "to do [her] assigned job and be rigorously and impartially evaluated for continuous employment as all other educators."  (Doc. 15, pp. 9–10.)  Furthermore, Plaintiff stated in her deposition that her failure to accommodate claim at least partially relies on the denial of her workers' compensation claim and Defendant's failure to "provid[e] [her] with a medical service to potentially get better so [she] could do the job that [she] was doing before."  (Doc. 17-2, p. 30.)

The Court finds that the EEOC Charge raised a failure to accommodate claim and a retaliatory discharge claim.  Concerning the failure to accommodate claim, Plaintiff expressly alleged in her EEOC Charge that she filed for workers' compensation benefits and that the claim

was subsequently denied.  Thus, Plaintiff's claim that Defendant failed to accommodate her disability by contesting and/or denying her workers' compensation claim (pretermitting whether such claim has any merit) was raised in her EEOC Charge.  (Doc. 1-2, p. 1.)  While Plaintiff did not use the phrases "reasonable accommodation" or "failure to accommodate," the proper focus is on Plaintiff's *factual* allegations in the EEOC Charge and not the "legal conclusion" attached to the facts alleged.  See, e.g., Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462 (5th Cir. 1970) ("[T]he crucial element of a charge of discrimination is the factual statement contained therein. Everything else entered on the form is, in essence, a mere amplification of the factual allegations. The selection of the type of discrimination alleged . . . is in reality nothing more than the attachment of a legal conclusion to the facts alleged.").  Thus, under the liberal reading mandated by Eleventh Circuit precedent, the Court finds that Plaintiff raised a claim, in her EEOC Charge, that Defendant failed to accommodate her disability by denying her workers' compensation benefits.

Concerning the retaliation claim(s), the main act Plaintiff complains about in the EEOC Charge is her termination.  Reading the facts alleged in the EEOC Charge, a "reasonable EEOC investigator" would "presumably investigate[], at least in some fashion, the possible reasons why" Plaintiff was terminated, including the possibility that Defendant retaliated against Plaintiff in violation of the ADA.  See Gregory, 355 F.3d at 1280.  In other words, an investigation into whether Plaintiff was terminated due to her disability—an issue Defendant concedes was raised in the EEOC Charge—would have also "uncovered any evidence of retaliation" because the EEOC investigator would presumably explore the reasons why Defendant terminated Plaintiff.  Id.  While Plaintiff did not check the "retaliation" box on the EEOC Charge, whether a Plaintiff marks the proper box on a charge form is not dispositive of what claims the EEOC Charge encompasses. See id. (finding that the plaintiff alleged facts that encompassed a retaliation claim despite

plaintiff's failure to check the retaliation box); <u>Jean-Pierre v. Naples Cmty. Hosp., Inc.</u>, 817 F. App'x 822, 829 (11th Cir. 2020) (same); <u>Batson</u>, 897 F.3d at 1328 ("Even though Batson did not mark the retaliation box on the form, . . . the information included in the Charge was sufficiently 'related to' Batson's retaliation claim to satisfy the exhaustion requirement."). Thus, the EEOC Charge encompasses Plaintiff's retaliatory discharge claim.

However, to the extent Plaintiff is asserting retaliation claims for the other allegedly retaliatory conduct raised in her Motion for Summary Judgment, (doc. 15, pp. 9–10), Plaintiff did not exhaust her administrative remedies as to those claims. The only plausible retaliatory conduct Plaintiff raises in the EEOC Charge is her termination and her transfer (prior to the termination) to Bloomingdale Elementary, which—as discussed in Section I.B, <u>infra</u>—was not timely raised. The other conduct is not raised anywhere in the EEOC Charge, nor is that conduct like or related to the allegations in the EEOC Charge. Instead, these acts are new and discrete acts of retaliation "that are offered as the essential basis for requested judicial review." <u>Kelly v. Dun & Bradstreet, Inc.</u>, 557 F. App'x 896, 899 (11th Cir. 2014). Thus, to the extent Plaintiff relies on any of the other conduct listed in her Motion for Summary Judgment as the "essential basis" for additional retaliation claims, those claims are not properly before the Court. <u>See</u> <u>Swindle v. Hale</u>, No. 2:09-cv-1458-SLB, 2012 WL 4725579, at *21 (N.D. Ala. Sept. 30, 2012) ("Plaintiff did not include in her EEOC charge any argument that she was retaliated against by having to work at the Bessemer office, that Deputy Arnold allegedly refused to provide her transportation, that she was denied medical care and leave, that Sheriff Hale did not respond to her grievance, or that Newton and

Stone were returned to the Bessemer Division.  To the extent plaintiff seeks to claim these acts as a basis for retaliation, the court finds they are due to be dismissed for failure to exhaust.").[7]

### B.    Timeliness of EEOC Charge

Defendant next argues that "[a]ny claims for alleged acts of discrimination before April 25, 2019, are untimely."  (Doc. 17, pp. 19–20.)  "An employee making a discrimination claim under the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination

---

[7]  Though the EEOC Charge did not raise a retaliation claim based on Defendant's provision of "not so good" references, the Court notes that—to the extent Defendant gave those references *after* Plaintiff filed her EEOC Charge—there is some authority to suggest that Plaintiff need not separately exhaust that claim. See Gupta v. E. Tex. State Univ., 654 F.2d 411 (5th Cir. 1981); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 168–69 (11th Cir. 1988).  In Gupta, the former Fifth Circuit held that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." 654 F.3d at 413–14. However, neither party cites to or addresses these cases, nor did Plaintiff raise the Gupta exception in support of exhaustion. Thus, the Court does not consider its application here.  See Ellison v. Brennan, No. 3:19-cv-726-J-34PDB, 2020 WL 2523287, at *8 (M.D. Fla. May 18, 2020)  ("Given Ellison's apparent decision not to rely on the Gupta exception in his brief, the Court will not consider its application here . . . ."); see also, e.g., United States v. Londono, 824 F. App'x 885, 887 (11th Cir. 2020) ("Although we liberally construe pro se briefs, we do not make arguments for the parties . . . .").

Even if Plaintiff raised the Gupta exception, the viability of that exception is a matter of dispute among courts as both Gupta and Baker were decided prior to the United States Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), which held that discrete acts of employment discrimination and retaliation are separate, actionable incidents that must be timely exhausted. See Morgan, 536 U.S. at 110–15. Indeed, following Morgan, circuit courts are split on whether discrete acts of post-charge retaliation must be separately exhausted. See, e.g., Bennett v. Chatham Cnty. Sheriff Dep't, 315 F. App'x 152, 162 n.7 (11th Cir. 2008) ("Circuits disagree on whether, after [Morgan], discrete acts of retaliation must be exhausted."). The Eleventh Circuit has not squarely addressed this issue, and as a result, district courts within the Eleventh Circuit are also split on whether the Gupta exception is still viable. See Garcia v. Baptist Health S. Fla., Inc., No. 12-23765-CIV, 2013 WL 632963, at *4–5 (S.D. Fla. Feb. 20, 2013) (noting that some "district courts of the Eleventh Circuit have . . . applied the reasoning of Morgan to bar post-charge acts of retaliation for which the plaintiff did not initiate a separate EEOC charge" while others "have declined to apply Morgan to post-charge retaliation claims"); Ellison, 2020 WL 2523287, at *8 n.6 (collecting cases).

Furthermore, even assuming the Gupta exception is still viable, the Court questions whether it applies to Plaintiff's retaliation claim—to the extent the claim relies on post-charge conduct—because Plaintiff does not appear to allege that Defendant gave poor references or otherwise retaliated against her for filing the EEOC Charge. See, e.g., Thomas v. Miami Dade Pub. Health Tr., 369 F. App'x 19, 23 (11th Cir. 2010) ("[T]he district court could only consider claims to the extent Thomas contended they were caused by the filing of her EEOC charge, and any other causes for such actions were properly not considered."). However, because Plaintiff failed to raise the Gupta exception, the Court need not decide these issues.

with the EEOC." Batson, 897 F.3d at 1327.  To satisfy this exhaustion requirement, the filing of

the EEOC Charge must be timely.  Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169,

1178 (11th Cir. 2005).  Under the ADA, a plaintiff must file the charge within 180 days after the

alleged unlawful employment practice occurred.  See 42 U.S.C. § 12117(a) (incorporating Title

VII filing requirements to ADA actions); see also 42 U.S.C. § 2000e-5(e)(1).

    Here, Plaintiff filed her EEOC Charge on October 22, 2019.  (Doc. 1-2, p. 1.)  Counting

back 180 days from that date, any of Plaintiff's claims for alleged acts of discrimination,

retaliation, or failures to accommodate that occurred before April 25, 2019, are untimely.

    While Plaintiff does not directly address Defendant's failure to exhaust arguments, she

does appear to invoke the "continuing violation" doctrine in her Motion for Summary Judgment

by asserting that Defendant engaged in "continuous acts of retaliation."  (Doc. 19, p. 11.)  While

"[s]trict adherence to" timely filing requirements "is the best guarantee of evenhanded

administration of the law," Morgan, 536 U.S. at 108, the continuing violation doctrine does provide

an exception to the 180-day time limit, see Ward v. Glynn Cnty. Bd. of Comm'rs, No. 2:15-cv-

077, 2016 WL 4269041, at *14 (S.D. Ga. Aug. 11, 2016).  Pursuant to the continuing violation

doctrine, a plaintiff "may file a valid charge of discrimination based upon [an] illegal practice until

180 days after the last occurrence of an instance of that practice."  Beavers v. Am. Cast. Iron Pipe

Co., 975 F.2d 792, 796 (11th Cir. 1992) (quotation and citation omitted).  However, the doctrine

does not apply when an employer commits "discrete act[s] of discrimination more than 180 days

prior" to the employee's filing of the EEOC Charge.  Id.  Indeed, "discrete discriminatory acts are

not actionable if time barred, even when they are related to acts alleged in timely filed charges.

Each discrete discriminatory act starts a new clock for filing charges alleging that act."  Morgan,

536 U.S. at 113.  As such, "[d]iscrete acts such as termination, failure to promote, denial of transfer,

or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  Id. at 114.  "A party, therefore, must file a charge within 180 days of the date of a discrete discriminatory or retaliatory act or lose the ability to recover for it."  Stewart v. Jones Utility & Contracting Co., 806 F. App'x 738, 741 (11th Cir. 2020).

Here, to the extent Plaintiff does invoke the continuing violation doctrine, it does not apply because the alleged discriminatory acts that occurred prior to April 25, 2019, are discrete acts.  For example, the poor scores on job performance evaluations in 2018, the denial of Plaintiff's workers' compensation claim on January 30, 2019, the transition of Plaintiff from a classroom teacher to a teacher-on-loan on January 29, 2019, the denial of Plaintiff's "light duty" request on February 4, 2019, the presentment of the PDP to Plaintiff on February 7, 2019, and the transfer to Bloomingdale Elementary on February 11, 2019, are all acts that are "easy to identify."  Morgan, 536 U.S. at 114.  Indeed, unlike hostile work environment claims, whose "very nature involves repeated conduct" that "cannot be said to occur on any particular day," Plaintiff is asserting disability discrimination, failure to accommodate, and retaliation claims based on individual and identifiable acts that occurred on particular days.  Id. at 115; see also Abram v. Fulton Cnty. Gov't, 598 F. App'x 672, 676 (11th Cir. 2015) ("[A]ll of [the plaintiff's] claims, each of which alleged a specific instance of Fulton County's failure to grant her requested accommodations, involved discrete acts of alleged discrimination."); Manley v. Dekalb County, 587 F. App'x 507, 512 (11th Cir. 2014) ("[T]he alleged denial of promotions, write-ups, and suspensions . . . were all discrete acts of discrimination."); Windham v. Barr, No. 5:16-cv-83, 2019 WL 1412119, at *12 (S.D. Ga. Mar. 28, 2019) ("Because Plaintiff did not contact the EEO office until March 3, 2014, her retaliatory transfer claims regarding the January 8 and 13, 2014 transfers . . . are barred as a matter

of law."); <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, No. 02-0629-CB-M, 2002 WL 35649412, at *3 (S.D. Ala. Nov. 15, 2002) ("Plaintiffs . . . allege such discrete discriminatory acts as failure to promote, failure to assign light duty work, and other discriminatory job and work assignments. . . . Therefore, each disparate treatment cause of action based on those acts . . . is untimely."), *aff'd in part by* 516 F.3d 955 (11th Cir. 2008); <u>Terhune v. Potter</u>, No. 8:08-cv-1218-T-23MAP, 2009 WL 2382281, at *4 (M.D. Fla. July 31, 2009) ("The plaintiff's retaliation claims are . . . untimely. Although perhaps 'related' to the plaintiff's discrimination claim, the two . . . 'retaliatory' acts constitute discrete acts of discrimination."); <u>Johns v. Marsh & McLennan Agency LLC</u>, No. 3:19-cv-687-ALB-SRW, 2020 WL 1540397, at *2 (M.D. Ala. Mar. 31, 2020) ("The denial of a reasonable accommodation for a disability is a discrete act of discrimination.").

Therefore, Plaintiff needed to file a discrimination charge based on these acts within 180 days of their occurrence.  Her failure to do so bars her from bringing claims on these grounds. Accordingly, to the extent Plaintiff's claims rely on discriminatory and retaliatory acts that occurred prior to April 25, 2019, Plaintiff failed to exhaust her administrative remedies as to those claims.

In sum, the only retaliation claim timely raised in Plaintiff's EEOC Charge is the claim based on Plaintiff's non-renewal.  Furthermore, any claims for alleged acts of discrimination, retaliation, or failures to accommodate that occurred before April 25, 2019, are time-barred.  Thus, while Plaintiff's EEOC Charge encompassed her failure to accommodate claim based on the denial of her workers' compensation claim, Plaintiff did not raise that claim in a timely manner. Accordingly, the only claims properly before the Court are Plaintiff's disability discrimination claim, her retaliatory discharge claim, and her failure to accommodate claim to the extent it relies on Defendant's conduct occurring on or after April 25, 2019.

## II.     Merits of Plaintiff's Claims

### A.     Disability Discrimination

"The ADA was enacted to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life." Harrison v. Benchmarks Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010) (citation and internal quotation omitted).  As such, the ADA provides that no covered entity (i.e., employer or labor organization) "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

"[C]laims brought under the ADA [are evaluated] under the McDonnell Douglas framework, under which the plaintiff must first establish a prima facie case of discrimination."[8] Gilliard v. Ga. Dep't of Corr., 500 F. App'x 860, 867 (11th Cir. 2012) (per curiam).  Where, as here, the plaintiff fails to point to direct evidence of discrimination, he or she may establish a prima facie case of an ADA violation through circumstantial evidence.[9]  Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001).  If the plaintiff makes the prima facie showing, then the

---

[8]  Although the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), originated in the Title VII context, the Eleventh Circuit has since utilized it to analyze claims arising under the ADA.  See, e.g., Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (ADA case decided using McDonnell Douglas framework).

[9]  Defendant argues that Plaintiff cannot show direct evidence of disability discrimination, (doc. 17, p. 22), and Plaintiff does not dispute this assertion.  Indeed, Plaintiff stated in her deposition that no one told her that her termination or any other discriminatory conduct was due to her back condition, depression, or anxiety.  (Doc. 17-2, pp. 28–29.)  See Akouri v. State of Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) ("[D]irect evidence [is] evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.  Therefore, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.") (internal citations and quotations omitted).  Thus, Plaintiff must rely on circumstantial evidence to establish a prima facie case of disability discrimination.

burden shifts to the employer to "'articulate a legitimate, non-discriminatory reason' for the challenged action." Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 828 (11th Cir. 2019) (quoting Wascura, 257 F.3d at 1242).  If the employer does so, the burden then shifts back to the employee to show that the employer's proffered reason is mere pretext.  Id.

### 1.    Prima Facie Case

To establish a prima facie case of disability discrimination, a plaintiff must show that she "(1) has a disability; (2) is qualified for the job, with or without reasonable accommodations; and (3) suffered an adverse employment action because of her disability." Menzie v. Ann Taylor Retail Inc., 549 F. App'x 891, 893–94 (11th Cir. 2013) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1445 (11th Cir. 1998)).  For purposes of disability discrimination claims under the ADA, "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Id. at 894 (quoting Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  In other words, an adverse employment action must "result[] in some tangible, negative effect on the plaintiff's employment." Lucas, 257 F.3d at 1261.

Here, Plaintiff met this burden as to her termination.  Defendant concedes that issues of material fact exist as to whether Plaintiff has a qualifying disability under the ADA and whether Plaintiff was qualified for the job with or without reasonable accommodation.  (Doc. 17, p. 23.) Defendant also concedes that Plaintiff's non-renewal constitutes an adverse employment action for purposes of the ADA disability discrimination claim.  (Id.); see also Menzie, 549 F. App'x at 894 ("An adverse employment action is an ultimate employment decision, such as discharge . . .

."); Griffith v. Nicholas Fin., Inc., 214 F. Supp. 3d 1215, 1225 (N.D. Ala. 2016) ("The termination of a person's employment is the classic and ultimate tangible employment action.") (quotations omitted).

Concerning Defendant's other conduct, including (1) the April 25, 2019, deposition related to the workers' compensation case; (2) the April 29, 2019, meeting regarding parent and student complaints about Plaintiff; (3) Principal Parks' decision to make Plaintiff work in the media room during the pending investigation; and (4) the May 6, 2019, meeting in which Principal Parks notified Plaintiff of the non-renewal recommendation, the Court finds that those are not adverse employment actions.[10]  Plaintiff concedes that the deposition for her workers' compensation case was not discriminatory, (doc. 17-2, pp. 31–32), and she presented no evidence showing it was an adverse employment action.   Concerning the decision to require Plaintiff to work in the media room, "[c]ourts have consistently held that being placed on administrative leave pending an internal investigation is not an adverse employment action," especially in situations—like here— where the plaintiff's benefits and compensation did not change.  Carrio v. Apollo Grp., No. 1:07-CV-1814-BBM, 2009 WL 2460983, at *15 (N.D. Ga. Aug. 7, 2019); see also Benavides v. City of Oklahoma City, 508 F. App'x 720, 725 (10th Cir. 2013) (finding that paid administrative leave does not constitute an "adverse employment action" for a disability discrimination claim under the ADA); McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007) (finding that paid administrative leave did not constitute an adverse employment action for Title VII discrimination claim); Davis v. Legal Servs. Ala., Inc., 472 F. Supp. 3d 1123, 1130–31 (M.D. Ala. 2020) (collecting cases).  Furthermore, while Principal Parks' notification to Plaintiff of her non-renewal recommendation (at the May 6, 2019, meeting) could constitute an adverse employment action

---

[10]    As discussed in Discussion Section I.B, supra, the Court only considers Defendant's purported discriminatory conduct that occurred on or after April 25, 2019.

under certain circumstances, Plaintiff failed to present or point to any evidence showing that such circumstances exist.[11]  Indeed, Plaintiff failed to point to any record evidence showing that any of these acts were "ultimate employment decisions" or had "tangible, negative effect[s]" on her employment status.   See Holmes v. Fulton Cnty. Sch. Dist., No. 1:06-CV-2556-CC-AJB, 2007 WL 9650147, at *26 (N.D. Ga. Dec. 24, 2007) ("Plaintiff conclusorily states that she 'has suffered several adverse employment actions at the hands of Defendant' after which she lists a series of alleged adverse actions . . . without any explanation as to why these are adverse employment actions.  This is an inadequate showing . . . to survive summary judgment.") (citing Fed. R. Civ. P. 56(e); Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000)).

Because Plaintiff made the requisite showing for a prima facie case of disability discrimination based on her termination, the burden shifts to Defendant to show that it had a legitimate, non-discriminatory reason for this act.  See Connelly, 758 F. App'x at 828.

### 2.    Legitimate, Non-Discriminatory Reasons for Conduct

Once a plaintiff establishes a prima facie case of disability discrimination, the burden shifts to the defendant employer to "articulate a legitimate, non-discriminatory reason" for the challenged actions.  Id.  To satisfy this burden, Defendant "does not have to 'persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not

---

[11]  Such circumstances include a "cat's paw" situation.  Under the cat's paw theory, "[a]n adverse employment action recommendation by a person with no power to actually discharge an employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's adverse employment action." Scarbary v. Ga. Dep't of Nat. Res., 245 F. Supp. 3d 1328, 1333 n.6 (N.D. Ga. 2017) (citing Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294 (11th Cir. 1988)); see also Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) ("[U]nder the 'cat's paw' theory . . . causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw[,]' to give effect to the recommender's discriminatory animus.").  However, Plaintiff has not argued or presented any evidence showing that the cat's paw theory applies in this case.

proof.'" Griffith, 214 F. Supp. 3d at 1227 (quoting Gray v. City of Jacksonville, 492 F. App'x 1, 7 (11th Cir. 2012)). Here, Defendant contends—and points to evidence in the record tending to show—that Plaintiff was insubordinate and poorly performed her job. (Doc. 17, p. 25.) Because these are legitimate, non-discriminatory bases for termination, Defendant has satisfied its burden. See Jarvis v. Siemens Med. Sols. USA, Inc., 460 F. App'x 851, 857 (11th Cir. 2012) (finding that "poor job performance" and "insubordination" were legitimate, non-discriminatory reasons for terminating an employee); Griffith, 214 F. Supp. 3d at 1227 ("[I]nsubordination is a legitimate, nondiscriminatory basis for termination . . . ."); Corning v. LodgeNet Interactive Corp., 896 F. Supp. 2d 1138, 1150 (M.D. Fla. 2002) ("By producing evidence demonstrating Corning's job performance issues, LodgeNet articulated a legitimate, nondiscriminatory reason for its actions.").

### 3.    Pretext

Because Defendant articulated legitimate, non-discriminatory reasons for not renewing Plaintiff's employment, the burden shifts back to Plaintiff to show that those reasons were pretextual. Wascura, 257 F.3d at 1243. A plaintiff may satisfy this burden "by offering evidence that [the employer] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "To establish pretext, an employee must present evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Connelly, 758 F. App'x at 828–29 (quoting Wascura, 257 F.3d at 1243). "An employee may do this by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions' in the employer's proffered reasons that a reasonable factfinder would find them 'unworthy of credence.'" Id. at 829 (quoting

Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1348 (11th Cir. 2007)).  If the "proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarrelling with the wisdom of that reason."  Alvarez, 610 F.3d at 1265–66 (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).

Plaintiff does not expressly point to any evidence of pretext in her Complaint or in her Motion for Summary Judgment.  (See generally docs. 1, 1-1, 15, 19.)  Even assuming that Plaintiff intended to attack "head on" Defendant's proffered reasons for her non-renewal, her claim fails. The closest Plaintiff comes to making an argument for pretext is disputing the accuracy of her PDP and performance evaluations, (doc. 1-1, pp. 1–2; doc. 17-2, pp. 28–29, 67; doc. 19, pp. 9–10), alleging that she was terminated because Principal Parks "conspired with counterparts" who wanted to "remove the blame" from their and the Board of Education's "shoulder[s]" so they could "scapegoat [her] for discrimination purposes," (doc. 1-1, p. 2; see also doc. 17-2, pp. 43, 45–46; doc. 19, p. 12), and calling the student and parent complaints "false allegations," (doc. 17-2, pp. 66–67; see also doc. 19, p. 8).

Though Plaintiff disputes the accuracy of the PDP and her performance evaluations, "the inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance."  Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997), *abrogated on other grounds by* Lewis v. City of Union City, 918 F.3d 1213 (11th Cir. 2019); see also Alvarez, 610 F.3d at 1266 ("The inquiry into pretext centers . . . not on reality as it exists outside of the decision maker's head.").  "Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an

employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." Holifield, 115 F.3d at 1565.

Here, Defendant has produced an abundance of evidence illustrating Plaintiff's poor job performance, including poor communication and insubordination. For example, in the November and December 2018 performance evaluations, Principal Byrd and Assistant Principal Tucker gave Plaintiff deficient scores in the communication, positive learning environment, and differentiated learning categories. (Doc. 17-2, pp. 79–84.) Assistant Principal Tucker even commented, "Clear communication with parents and co-workers is not always observed. . . . [R]edirection of students was observed to be somewhat harsh at times. Moving forward, please consider a more appropriate tone." (Id. at p. 84.) The PDP also noted Plaintiff's poor communication, as the "Professional Learning Goal" listed in the PDP was for Plaintiff "[t]o engage in consistent communication with . . . staff, students, families, and administrators[] that is effective and shares expectations and student progress in ways that enhance student learning." (Id. at p. 97.) The record also shows that Plaintiff struggled with the same deficiencies in her job performance after transferring to Bloomindale Elementary. Indeed, the students there complained that Plaintiff "yelled a lot and at every[body]" and "was . . . mean." (Doc. 17-7, pp. 27–29.) In addition, when Principal Parks asked Plaintiff to meet with her to discuss these complaints, Plaintiff refused to discuss them and stated that she "should not have to account for false information these students . . . share[] with their parents." (Id. at p. 81.) Then, when presented with additional opportunities to meet with Principal Parks to discuss the complaints, Plaintiff accused Principal Parks of harassing her. (Id. at p. 19.) These complaints as well as Plaintiff's response led Principal Parks to issue a Letter of Serious Concern for Plaintiff's "insubordination." (Id. at p. 47.) Indeed, Plaintiff admits that she refused to comply with Principal Parks' demands to discuss and resolve the parent and student

complaints, which Principal Parks and other school officials believed amounted to insubordination worthy of termination.  (Id. at pp. 80–84.)  Then, in the summative evaluation, Principal Parks— like Principal Byrd and Assistant Principal Tucker—gave Plaintiff deficient scores in the communication and positive learning environment categories, and she also gave a deficient score in the professionalism category.   (Id. at pp. 43–44, 47–48.)   Finally, Principal Parks, Superintendent Lovett, and Ray all stated in their Affidavits that Plaintiff was terminated because of poor job performance and insubordination.  (Doc. 17-4, p. 5; doc. 17-5, p. 6; doc. 17-7, pp. 7– 8.)   While Plaintiff contests the assertions that she was insubordinate and that she was not performing her job well, (doc. 19, pp. 9–10), the proper inquiry focuses on whether school officials *believed* Plaintiff was insubordinate and not performing her job well.  The foregoing evidence and the record indisputably show that they did.

Furthermore, Plaintiff offers no evidence—other than her own speculation—to support her allegations that school administrators conspired to terminate her because of her disability and "falsified" the PDP and performance evaluations.  "To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  Without supporting evidence, the allegations here are insufficient to establish pretext.  Holifield, 115 F.3d at 1565 ("[Plaintiff's] assertion that the defendants began documenting an untrue assessment of his performance in order to terminate him because of his race is unsubstantiated."); Todd v. McCahan, 158 F. Supp. 2d 1369, 1380 (N.D. Ga. 2000) ("Plaintiff contends . . . that the incidents involving . . . customer complaints were fabricated and/or staged as part of a 'ruse designed to mask Defendant's retaliation.'  However, Plaintiff offers no evidence other than his unsubstantiated

opinion.  Therefore, Plaintiff has not established pretext as an element of his prima facie case . . . .").  Indeed, construing the evidence in the light most favorable to Plaintiff, the record shows that the initial performance evaluations could not have been part of a conspiracy to terminate Plaintiff due to her disability because those evaluations occurred *before* anyone at Pulaski Elementary or Bloomingdale Elementary even knew about Plaintiff's back condition.[12]  Furthermore, there is no evidence that anyone at Bloomingdale Elementary knew that Plaintiff suffered from a back condition before or during the time she received poor performance reviews, was given the Letter of Serious Concern, or was recommended for nonrenewal.  Moreover, as stated above, the record shows continuous deficiencies in Plaintiff's job performance, including insubordination and poor communication, consistent with Defendant's reasons for not renewing her employment.  In the face of an abundance of evidence supporting Defendant's legitimate, non-discriminatory reasons, Plaintiff's conclusory and speculative allegations of a conspiracy to terminate her employment because of her disability—without supporting evidence—fails to establish pretext.  See White v. Dixie, 741 F. App'x 649, 657 (11th Cir. 2018) ("White believes that Winn Dixie concocted his [performance improvement plan ("PIP")] and his alleged performance deficiencies as a pretext to terminate him.  But the record reveals long-standing performance deficiencies consistent with the PIP and Winn Dixie's reasons for termination.").

In sum, Defendant articulated poor job performance and insubordination as legitimate, non-discriminatory reasons for terminating Plaintiff's employment.  Plaintiff, however, has failed to raise sufficient evidence from which a reasonable jury could find that those reasons were a pretext for disability discrimination.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary

---

[12]  Plaintiff admits that she never mentioned to anyone at Pulaski Elementary that she suffered from a back condition until after her falling incident on January 30, 2019.  (Doc. 17-2, p. 22.)

Judgment, (doc. 17), and **DENIES** Plaintiff's Motion for Summary Judgment, (docs. 15, 19), as to Plaintiff's ADA disability discrimination claim.

### B.     Failure to Accommodate

"[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." Connelly, 758 F. App'x at 831 (quoting Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007)).   Where a plaintiff alleges a failure to accommodate, "[a]n employer unlawfully discriminates against a [disabled individual] when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." Lucas, 257 F.3d at 1255 (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).   "[A]n employee need only identify an accommodation and demonstrate that it is reasonable." Connelly, 758 F. App'x at 831.   However, "an employer's duty to provide a reasonable accommodation is not triggered unless and until the employee makes a specific demand for an accommodation." Id. (citing Frazier-White v. Gee, 818 F.3d 1249, 1255–56 (11th Cir. 2016)).   Thus, "[t]he plaintiff bears the burden both to identify an accommodation and show that it is reasonable." Rabb v. Sch. Bd. of Orange Cnty., 590 F. App'x 849, 850 (11th Cir. 2014) (citing Willis v. Conopco, Inc., 108 F.3d 282, 284–86 (11th Cir. 1997)).

Here, Plaintiff does not allege or provide any evidence that she requested a disability-specific accommodation on or after April 25, 2019.[13]   Indeed, the most recent of Defendant's acts alleged in Plaintiff's Complaint that could plausibly constitute a failure to accommodate is Principal Byrd's denial of Plaintiff's light duty request.   However, as explained above, that claim

---

[13]   As discussed in Section I.B, supra, any claims based on failures to accommodate committed prior to April 25, 2019, are time-barred.   Thus, the Court's analysis of Plaintiff's failure to accommodate claim is limited to acts committed by Defendant on or after April 25, 2019.

is time-barred because it occurred in February 2019.  Because Plaintiff has not shown that she made a specific demand for an accommodation on or after April 25, 2019, her failure to accommodate claim fails.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 17), and **DENIES** Plaintiff's Motion for Summary Judgment, (docs. 15, 19), as to Plaintiff's ADA failure to accommodate claim.

      **C.**    **Retaliation**

      Under the ADA's anti-retaliation statute, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. §12203(a); see also Connelly, 758 F. App'x at 832 ("To state a retaliation claim under the ADA, an employee must show that her employer discriminated against her for opposing an act or practice made illegal under the ADA.").  Like with disability discrimination claims, federal courts evaluate ADA retaliation claims using the McDonnell Douglas burden-shifting framework.  Connelly, 758 F. App'x at 832. To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal link between the adverse action and the protected activity.  Stevens v. S. Nuclear Operating Co., Inc., 209 F. Supp. 3d 1372, 1381 (S.D. Ga. 2016) (citing Lucas, 257 F.3d at 1260–61).  "Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation."  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).  "The plaintiff must then demonstrate that it will be able to establish at trial that the

employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." Id.

To the extent Plaintiff claims that Defendant terminated her in retaliation for filing a workers' compensation claim and attending a deposition regarding her workers' compensation case, that claim fails.  "[N]early every court that has confronted the issue has held that the filing of a workers' compensation claim in itself is not protected activity under the ADA—in other words, that an ADA-based claim of retaliation for the filing of a workers' compensation claim cannot stand." Arnold v. Pfizer, Inc., 970 F. Supp. 2d 1106, 1141 (D. Or. 2013) (quoting Kendall v. Donahoe, 913 F.Supp.2d 186, 193 (W.D. Pa. 2012)); see also Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 154 (4th Cir. 2012) ("The ADA's retaliation provision only prohibits retaliation against a person because the person 'opposed any act or practice made unlawful *by this chapter*' or 'made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing *under this chapter*.  Filing a workers' compensation claim is not something that is covered by the ADA . . . ."); Bennett v. Project Renewal, Inc., 627 F. App'x 29, 31 (2d Cir. 2015) ("Bennett's claims of discrimination and retaliation based on her filing of a workers' compensation claim do not allege . . . engagement in any activity protected by . . . the ADA."); Lanza v. Postmaster Gen. of U.S., 570 F. App'x 236, 241 (3d Cir. 2014) ("Filing a claim for workers' compensation does not constitute protected activity under either the Rehabilitation Act or Title VII.").

Furthermore, even assuming that Plaintiff could establish a prima facie case of retaliation under the ADA, Plaintiff—for the same reasons discussed in Section II.A.3, supra—failed to demonstrate that Defendant's proffered reasons for terminating her employment were pretextual. Indeed, Plaintiff's retaliation claim—like her disability discrimination claim—relies on her non-

renewal, an act for which Defendant proffered legitimate, nondiscriminatory reasons that Plaintiff failed to show were pretextual.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 17), and **DENIES** Plaintiff's Motion for Summary Judgment, (docs. 15, 19), as to Plaintiff's ADA retaliation claim.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Savannah-Chatham County Public School System's Motion for Summary Judgment.  (Doc. 17.)  The Court also **DENIES** Plaintiff's Motion for Summary Judgment.  (Docs. 15, 19.)  The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 11th day of August, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA